MEMORANDUM DECISION AND JUDGMENT ENTRY.
A jury found appellant Brandon Davis guilty of murder and two firearm specifications. The trial court convicted Davis and sentenced him to an indefinite term of 15 years to life for the murder and to three years' incarceration on the first specification. The specification sentence was to be served consecutively to the sentence imposed for murder.
Davis raises two assignments of error. He asserts first that the trial court wrongly imposed a three-year sentence, as opposed to a one-year sentence, on the gun specification. In his second assignment, he claims his conviction was against the manifest weight of the evidence because the state's witnesses were not credible.
Maceo Powell and Arvie Jenkins decided to attend the Kool Jazz Festival activities in downtown Cincinnati. Powell drove his father's pickup truck. While the traffic was gridlocked, Powell decided to exit from the driver's side of the truck to speak with some young women in the car in front of the truck. When he got to the taillight of the car, at least two unidentified people attacked him. An assailant placed one arm around Powell's neck and covered Powell's eyes with his left forearm. Powell felt under his chin a cold piece of metal that he assumed was a gun. He closed his eyes and slumped to the ground "in shock." Someone ripped a gold chain from his neck. While his eyes were closed, he heard one "boom," which he described as loud enough to be a gunshot. He opened his eyes and saw people running from the area. He then left the area himself.
He returned shortly, remembering that he had abandoned his father's truck in the middle of the street. When he got back in the truck, he noticed Jenkins was gone. Believing that Jenkins was probably nearby, Powell moved the truck, while keeping an eye out for Jenkins. Powell then saw Jenkins, who had been shot in the heart, lying in an ambulance. Jenkins later died at a hospital.
Two witnesses positively identified Brandon Davis as firing the fatal shot. One witness testified that she had seen some men kicking another man on the ground. She and some friends were videotaping the festivities. She then noticed a young black male standing on the sidewalk, less than a car length behind her. Because he was standing only two or three feet away from the men kicking the man on the ground, she believed that he was a part of that group. Although she viewed the young man only from the side, she had no problem seeing him, because the area was sufficiently illuminated by streetlights and car lights. She later identified him as Brandon Davis. She watched as Davis pulled a small black handgun from the waist of his shorts, took aim, and fired one shot. She testified that the crowd did not jostle Davis's arm.
The next day, she saw a news report about the incident and contacted the Cincinnati police. She provided them with her videotape and a description of the gunman, and helped in the preparation of a composite drawing of Davis. A couple of weeks later, she viewed a lineup in which she positively and unhesitatingly identified Davis as the gunman. She also identified him in court.
Another witness, who had been standing on the sidewalk, observed what he described as a "tussle" involving ten or twenty people beating up one person. He was located ten to fifteen feet to the left of the fight, and Davis was standing nearby on the right. The witness knew Davis from the streets as "Gambino." The witness saw Jenkins run toward the fight. He saw Davis stretch his arm in the direction of Jenkins. Davis was holding a black gun. The witness heard at least one shot and saw Jenkins grab himself and fall to the ground.
The police picked up the second witness and took him to the station for questioning because he appeared in the videotape and was a possible suspect. They informed him that they had information that he was the gunman. Initially, the witness informed the police that he had heard a shot, and that although he did not know who was involved, he had heard "Gambino" was the shooter. He refused to tell what he had observed because he was afraid there would be retaliation. He spoke with the police a second time, after Davis had been arrested, and told them what he testified to at trial — that Davis was the shooter.
Davis testified that he was on the street, but not near the fight, talking to a young woman from North Carolina named Michelle. He heard a gunshot and pulled out his ".380 automatic." He and others around him started running. His weapon discharged when someone pushed him from behind as he was pulling it out of his waistband.
Davis claimed that when he heard news reports the next day, he thought he might have shot someone. He also heard later that the police wanted to question him about the incident. He made no effort to contact the police. Two months later, he was arrested. During his interrogation, he told three different stories. He first claimed that he was not present and had nothing to do with the incident.